## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

PRUDENCE F. MAXON, individually
and on behalf of all others similarly situated,

       Plaintiff,

                           **CASE NO. 3:18-cv-00254-slc**

v.

SENTRY LIFE INSURANCE
COMPANY,

       Defendant.

_____

### DECLARATION AND REPORT OF SCOTT J. WITT

### Qualifications and Experience

1.      My name is Scott J. Witt. I am an actuary and president of Witt Actuarial Services, LLC, a fee-only insurance advisory and actuarial firm. I am an independent consultant who is compensated on a fixed fee or hourly basis by my clients. I have been engaged by Plaintiff Prudence F. Maxon through counsel to provide testimony as an actuarial expert in this case. I am being compensated at a rate of $450 per hour. For sworn testimony I am compensated at a rate of $550 per hour. For travel time I am compensated at a rate of $225 per hour. A copy of my CV, including a list of all publications I have authored in the previous ten years and a list of all other cases in which I have testified as an expert in the previous four years, is attached hereto as Exhibit A.

2.      Over the last 20-plus years I have worked extensively with life insurance products, both as an actuary for Northwestern Mutual Life and then as a fee-only insurance advisor. During my 20-plus years of experience as an actuary, I have obtained

comprehensive experience, knowledge, and expertise in many aspects of actuarial science and life insurance, including but not limited to: universal life insurance products; pricing and valuation of life insurance products; pricing and analysis of underlying assumptions used in the development of life insurance products; and analysis of risks associated with life insurance products. As part of my experience, I have routinely analyzed mortality assumptions, experience, and tables, as well as the rates used to assess monthly charges on life insurance products.

3.      In the ten years I spent as an actuary at Northwestern Mutual, I was positioned in several areas directly responsible for development, analysis, and management of life insurance, including whole, universal, variable, and term life products. My time at Northwestern Mutual included work on experience studies, valuation, marketing (or competition), corporate modeling, and life insurance product pricing. Through my various roles I directly participated in: evaluation and analysis of mortality experience and risk; development of mortality rate scales or tables; evaluation and analysis of policy interest rates; evaluation and setting of reserves, and ensuring compliance with statutory regulations regarding reserves; modeling performance of life insurance under changing policy scenarios, assumptions, and features; lapse support, self-support, and illustration testing; and review and analysis of pricing and repricing of life insurance products, among others.

4.      I have significant additional experience with life insurance products as a fee-only insurance advisor, where I am routinely required to offer unbiased objective advice to clientele as they plan to purchase or attempt to re-evaluate permanent life insurance products. In order to offer such advice, it is often necessary that I deconstruct

or reverse-engineer life insurance products, in particular the cash value components of permanent policies and their underlying rates and charges. Therefore, I have analyzed thousands of different life insurance products, including universal life insurance products with features like those related to the products at issue in this case.

5.      I have also served as an expert in litigation involving life insurance products, including recently in *Vogt v. State Farm Life Insurance Company*, No. 2:16-cv-04170-NKL in the Western District of Missouri, Central Division, where I testified as an expert at trial and presented a methodology for determination of class-wide damages resulting from cost of insurance overcharges on universal life insurance policies.

6.      I maintain the highest actuarial designations as a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. I am also a Financial Services Affiliate member of the National Association of Personal Financial Advisors. I am licensed to engage in the business of insurance in the state of Wisconsin, and I have completed the Series 65 examination administered by the Financial Industry Regulatory Authority.

7.      I am a 1993 graduate of Montana Tech with a B.S. in both mathematics and computer science. I graduated from Oregon State University in 1995 with a M.S. in statistics.

## Materials Considered

8.      In reaching my opinions, I have relied on the experience, knowledge, and expertise I have gained throughout my actuarial career, in particular, my knowledge and expertise with respect to universal life insurance products, and I have further relied upon

documents and materials known to me or generally available to actuaries practicing in the United States.

9.     In preparing to make this Declaration and Report, I have reviewed and relied upon documents provided to me by counsel for Ms. Maxon, including the following:

- Ms. Maxon's Class Action Complaint filed April 29, 2017, and Exhibit A attached to the Class Action Complaint (a copy of Ms. Maxon's life insurance policy at issue in this case);

- Ms. Maxon's discovery requests and the responses provided by Sentry over the course of the litigation.

- Documents produced by Defendant Sentry Life Insurance Company ("Sentry") to counsel for Ms. Maxon during the course of this litigation (Sentry000001 – 1877), including, but not limited to, the following:

  o Ms. Maxon's annual policy statements (generally appearing in Sentry's document production between Sentry000715-769);

  o The specimen policies associated with the six life insurance products at issue in this case, including the Comprehensive Universal Life II ("Comp II") (Sentry000195-214, 824-845), Comprehensive Universal Life III ("Comp III") (Sentry000215-238), Comprehensive Universal Life I ("Comp Life I") (Sentry000177-195), Salary Savings Universal Life ("SSUL") (Sentry000343-365), Sentry Plus Universal Life ("SPUL") (Sentry000313-342), and Contemporary Life Plus ("EIWL") (Sentry000394-411) (collectively, the "Class Products");

  o Certain pricing materials, actuarial memoranda, mortality expectations and assumptions, mortality studies, and mortality rate tables provided by Sentry (located throughout its above referenced production); and,

  o Certain transactional and policy level data provided in Excel workbooks by Sentry for the products at issue in this case.

- Transcripts of, and exhibits to, the depositions of Sentry employee Carla Danczyk, former Sentry employee and designated representative Eric Pahl, Sentry employee and designated representative Tony Goettl, and former Sentry employee and designated representative Dave Derksen.

## Summary of Opinions

10.    Relying on my training, background, experience, and judgment as an insurance actuary, as well as my review of the documents identified above, I have reached the following opinions:

    a.  The Class Products are universal life insurance policies that are materially identical as to both the policy language in dispute in this case and the mechanics of how monthly deductions and cash values are determined and calculated.

    b.  

    c.

    d.  Using Sentry's own data and the models/formulae proposed herein, I can demonstrate harm to the proposed class members by determining the portion of periodic Mortality Rates and Charges in excess of Sentry's expectations as to future mortality experience. I can then determine damages by taking those overcharges and applying interest allowable under the terms of the policies to those overcharges. I can calculate these amounts to a reasonable degree of actuarial and mathematical certainty for each and every policy issued. Through discovery Sentry has demonstrated

that it has all the data necessary to perform these calculations. I demonstrate my methodology below using Ms. Maxon's policy as an example. Because the material terms of the Class Products are identical to those of the Maxon policy and the calculation of values for the Class Products operates mechanically in the same way, my demonstration for Ms. Maxon is sufficient to show that the methodology is applicable to all other Class Products.

11.    My analysis is ongoing, and I may amend or supplement my opinions and/or methodologies at a later date as discovery in this matter progresses.

12.    All of my opinions and conclusions have been reached to a reasonable degree of actuarial and mathematical certainty consistent with my training, experience, education, and judgment as an insurance actuary.

## Ms. Maxon's Class Action Counts

13.    I understand that the First Count in Ms. Maxon's Class Action Complaint asserts that the Mortality Rates provision in her policy, and in the Class Products, requires Sentry to calculate Mortality Charges using Mortality Rates that are based on Sentry's expectations as to future mortality experience. I understand that the First Count asserts that Sentry did, in fact, breach the policies by failing to set Mortality Rates solely using expectations as to future mortality experience, and instead set Mortality Rates in excess of rates determined only from Sentry's expectations as to future mortality experience. I understand Ms. Maxon asserts Sentry inflated its Mortality Rates and Mortality Charges by considering and using such factors as expenses, persistency/lapse, taxes, profit, investment earnings, and other factors to increase its Mortality Rates above the alleged limitation imposed by the policy language requiring Sentry to only use expectations as to future mortality experience in determining Mortality Rates.

14.     I understand that the Second Count in Ms. Maxon's Class Action Complaint asserts that the Class Products preclude Sentry from deducting non-mortality related monthly expense charges to class members in excess of the specific fixed amounts for the "Administrative Fee" identified in the policies. I understand the Second Count further asserts that Sentry did, in fact, breach the policies to the extent that its Mortality Rates and Charges include amounts for non-mortality related expenses to class members in excess of the fixed caps for such expenses set by the policies.

15.     I understand that the Third Count in Ms. Maxon's Class Action Complaint asserts that the Mortality Rates provisions of the Class Products require Sentry to reduce Mortality Rates if its expectations as to future mortality experience improve over time. I understand the Third Count further asserts that, because Sentry's expectations as to future mortality experience for universal life products have improved since Class Products were originally priced and subsequently re-priced (where applicable), Sentry was required to decrease its Mortality Rates to reflect that improvement (which would have the effect of decreasing Mortality Charges, and in turn would decrease the Cost of Insurance for each policy). Therefore, I understand that Ms. Maxon asserts that Sentry breached the policies to the extent that its Mortality Rates were not decreased when its expectations as to future mortality experience continually and substantially improved over the last two decades.

16.     I understand that Ms. Maxon asserts additional counts in her Class Action Complaint for conversion and declaratory and injunctive relief.

### Opinions and Analysis

**I.     The Class Products are materially identical universal life insurance policies.**

17.     Ms. Maxon purchased from Sentry a "Flexible Premium Adjustable Life Insurance" contract, bearing the policy number 4709952A and a policy date of August

18, 1988 ("Maxon's Policy," attached hereto with the Class Action Complaint as Exhibit B). Maxon's Policy had an initial specified amount of $100,000. Maxon's Policy is a Comprehensive Universal Life II policy. Ms. Maxon asserts class claims on behalf of owners of six Class Products, including the following: Comprehensive Universal Life II (Comp II), Comprehensive Universal Life III (Comp III), Comprehensive Universal Life I (Comp Life I), Salary Savings Universal Life (SSUL), Sentry Plus Universal Life (SPUL), and Contemporary Life Plus (EIWL). ████████████████████ ████████████████████████████████████████ ████████████████████

18.     All of the Class Products, and their underlying specimen policy forms, are a type of permanent life insurance policy commonly known in the industry as "universal life" insurance. Universal life policies differ from more "traditional" life insurance products, such as "term" insurance, in several respects.

- Generally speaking, universal life policies include an investment feature that allows the owner to pay premiums into a policy's cash value, also referred to as an account value or accumulation value. The cash value has the potential to grow over time with additional premium payments and applicable interest as laid out in the policy. The policy remains in force as long as the cash value remains positive, meaning it is sufficient to cover the policy's "Monthly Deduction" each month.

- ████████████████████ the monthly deduction taken from the cash value of universal life products typically includes separately identified and defined charges, including a cost of insurance charge and an expense

8

charge. See ███████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████.

- ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████See Goettl Dep. at 93:7-11; Derksen Dep. at 43:16-19.

- Universal life products were intended to offer more transparency to the policy owner than traditional life insurance products by separately identifying cash flows for premiums, policy charges, and interest gains. The monthly deductions for the policy are in essence "unbundled," meaning the monthly deductions are broken down into separately identified charges. Here, ██████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████See Goettl Dep. at 80:17-20, 93:12-14 ███████████████████

████████████████████████████████████████.

19.    Each of the Class Products is a universal life insurance product with the aforementioned policy features. I have attached the specimen policy forms for the Class

Products to this Declaration as Exhibits C through H.[1] The unbundling of policy charges for the Class Products is demonstrated in the "Nonforfeiture Provisions" section of each specimen policy form,[2] which also specifically identifies the formula for calculation of the policy "Cash Value." See Ex. C at p. 11-12, Ex. D at p. 10-12, Ex. E at Sentry000185-187, Ex. F at p. 7-9, Ex. G at p. 11-13, and Ex. H at p. 9-11.

20.     The Nonforfeiture Provisions of the Class Products are materially identical as described herein. The mechanics for calculation of Cash Value are also materially identical. Cash Value is calculated each policy month by taking the prior period's Cash Value plus premium payments less the "Monthly Deduction" plus applicable interest less partial surrenders where applicable.[3] See Ex. C at p. 11, Ex. D at p. 10, Ex. E at Sentry000185, Ex. F at p. 7, Ex. G at p. 11-12, and Ex. H at p. 9-10; ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.

---

[1] The exhibit references for each specimen policy form for the Class Products are as follows: Ex. C (Comp II), Ex. D (Comp III), Ex. E (Comp Life I), Ex. F (SSUL), Ex. G (SPUL), and Ex. H (EIWL).

[2] For the EIWL, this information is contained in the "Policy Values Provisions" section of the Policy, which is materially the same as the Nonforfeiture Provisions section of the other Class Products. For the EIWL, the "Cash Value" is also instead referred to as an "Accumulation Value," but it is otherwise materially the same as the Cash Value of the other Class Products.

[3] For the Comp I, SPUL, and EIWL, rather than applying the entirety of the premium to the policy Cash Value, a premium expense charge is taken off the top and the remainder (or "net premium") is applied. Additionally, the EIWL does not provide for partial surrenders in the formula set forth in its Policy Values Provisions. Nevertheless, the mechanics of the calculation of the Cash Value are materially identical as to that calculation for the other Class Products, and all applicable debits and credits to the Cash Value are plainly identified.

21.     Interest is credited to Cash Value at a rate not less than a guaranteed rate specified in the Class Products. The Class Products identify a guaranteed annual interest rate of 3.5%, 4.5%, or 5%, depending on the product. Ex. C at p. 11, Ex. D at p. 11, Ex. E at Sentry000185, Ex. F at p. 7-8, Ex. G at p. 12, and Ex. H at p. 10.

22.     The Class Products authorize a Monthly Deduction from Cash Value. The Monthly Deduction is comprised of an Administrative Fee[4] plus the Cost of Insurance, including the cost of any additional benefits provided by rider. Ex. C at p. 11, Ex. D at p. 11, Ex. E at Sentry000185, Ex. F at p. 7-8, Ex. G at p. 12, and Ex. H at p. 10.

23.     The formula for calculation of the monthly Cost of Insurance is uniform across the Class Products. It is determined by taking the product of the applicable monthly Mortality Charge multiplied by the policy's net amount at risk (discounted by one month of interest accrued at the minimum guaranteed rate). Ex. C at p. 12, Ex. D at p. 11, Ex. E at Sentry000186, Ex. F at p. 8, Ex. G at p. 13, Ex. H at p. 11. I provide an example of this provision from the Comp II policy below:

> **Cost of Insurance** – The cost of insurance for the policy is determined on a *policy month* basis. Such cost is calculated as (1) multiplied by the result of (2) minus (3), where:
>
> (1) Is the mortality charge (as described below);

---

[4] For four of the Class Products, the monthly Administrative Fee is fixed as follows: $5 for the Comp II, Comp III, and SSUL; and $7.50 for the SPUL. Ex. C at p. 12, Ex. D at p. 11, Ex. F at p. 8, Ex. G at p. 12. The monthly expense charge in the Comp I is not called an Administrative Fee, it is instead referred to as the Policy Charge but is functionally the same. The Policy Charge in the Comp I is a fixed fee during the first 12 policy months set at a monthly rate of $42.00 plus $0.09 per $1,000 of initial specified amount; thereafter, the charge is only assessed on specified amount increases in the month following such an increase at $1.00 per $1,000 of any increase in specified amount. Ex. E at Sentry000186. The EIWL does not have a separate policy expense charge within the monthly deduction – although, it does have a premium expense applied directly to premiums before deposited in the Cash Value. Ex. H at p. 9-10.

(2) is the death benefit at the beginning of the *policy month* divided by 1.0036748; and

(3) is the cash value at the beginning of the *policy month*, less the administrative fee for that *policy month* and the cost of insurance for any riders.

Ex. C at p. 12.

24.  In other words:

## Cost of Insurance = Mortality Charge x Net Amount at Risk

The net amount at risk ("NAR") generally represents the amount by which the policy's death benefit exceeds Cash Value. It is the amount of coverage against which Mortality Charges are assessed. In simpler terms, the NAR is the net amount of its own funds a life insurance company would expect to pay in the event the policy insured dies at any given time.

25.  Therefore, calculation of the Cost of Insurance is a purely mechanical process that is materially uniform for the Class Products, and, as demonstrated in paragraph 23 and 24 above, it is entirely a function of the NAR and Mortality Charge applicable to each policy.

26.  According to the policy language of each of the Class Products, the Mortality Charge is determined by application of a Mortality Rate. Each of the Class Products contains the same key provisions as to determination of the Mortality Rates that are at issue in this lawsuit. The Class Products all contain policy provisions providing that (1) current Mortality Rates are based on the insured's attained age, sex, and mortality

class,[5] and (2) further specifying that Sentry "*will determine the current mortality rates based on [Sentry's] expectations as to future mortality experience.*" Ex. C at p. 12, Ex. D at p. 12, Ex. E at Sentry000186, Ex. F at p. 8, Ex. G at p. 13, Ex. H at p. 11.

27.     As demonstrated above, the relevant policy language of the Class Products, and underlying specimen policy forms, are materially identical, as are the mechanics of how the policies operate, particularly the mechanics for determination of the policy Cash Value, Monthly Deduction, Cost of Insurance, Mortality Charge, and Mortality Rate.

**II.**     ██████████████████████████████████████████████
██████████████████████████████

28.     I assume for the purposes of my analysis that Ms. Maxon's policy interpretation is correct, and the Class Products require Mortality Rates to be determined exclusively using the age, sex, and mortality class of the insured, and Sentry's expectations of future mortality experience. From an actuarial perspective, I understand

████████████████████████████████████████████████

████████████████████████████████ See Derksen Dep. at 87:2-89:2

████████████████████████████████████████████

██████████████████████████████. From an actuarial perspective, I also understand expectations as to future mortality experience to specifically refer to the future risk or expectation that insureds sharing a common set of mortality characteristics will die. In other words, mortality expectations are probabilistic forecasts commonly associated with and quantified as rates.

---

[5] The SSUL does not separately identify "sex" in the Mortality Rates provision. Ex. F at p. 8. The EIWL refers to an insured's "class" rather than "mortality class." Ex. H at p. 11.

29.     Consistent with my understanding of expectations as to future mortality experience, Sentry's documents reference ██████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████

30.     Deposition testimony of Sentry's designated representatives ████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████

31.     Sentry also confirms that it ██████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

32.     Sentry's corporate representatives also offered testimony confirming that

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[6] Policy lapsation refers to policy termination for reasons other than death of the insured. Goettl Dep. at 35:23-36:1.



33. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

**III.** ████████████████████████████████

████████████████████████████████████████

██████████████████████████████

34.     As a general matter, future mortality rates are expected to improve over time. This is primarily attributable to advances (and projected advances) in medicine and positive changes in population behavior.

35.     Because of my training, experience, and education as an insurance actuary, including my knowledge of trends in the industry, I know that, generally speaking, people are living longer today than they did two and half to three decades ago ████████████████████████████████ I also know that the experience of the life insurance industry as a whole shows that mortality has improved over that time. I would expect Sentry's experience to generally follow industry mortality experience, ███ ████████████████████████████████████████ ██████████████

36.     Sentry documents show that ██████████████████████ ████████████████████████████████████████

[redacted]

37. [redacted] Recent and sustained trends in one direction are credible evidence that mortality expectations must be adjusted. Because they are in the business of insuring lives, it is critically important for life insurance companies to make credible assumptions for mortality risk associated with their insureds.

38. [redacted]



[redacted]

39. [redacted]

**IV.    The overcharges resulting from the alleged wrongful conduct can be calculated to a reasonable degree of actuarial and mathematical certainty.**

40.    My methodology for calculating amounts deducted in excess of Sentry's expectations as to future mortality experience for the Class Products, and the resulting losses for Ms. Maxon and all class members after accounting for applicable interest per the terms of the policy, can be used to a reasonable degree of actuarial and mathematical certainty to demonstrate harm and determine damages to class policy owners resulting from the wrongful conduct asserted by Ms. Maxon on behalf of the class. This methodology can also be used to calculate losses as of any date over the life of a policy. My methodology will compute the loss as of the last policy date for which Sentry has provided policy-level transactional data for in-force policies, and as of the termination date for terminated policies.

41.    I calculate losses that have occurred solely  Keeping all past policy activity unchanged, overcharges are identified by ▉▉▉▉▉▉▉▉ Applicable policy interest rates can then be applied to these overcharges as they accumulate over time to determine the total harm experienced by class policy owners.

42.    As described above, the Class Products provide for determination of Cash Value each month using a straightforward, arithmetic process. Generally speaking, the Cash Value is equal to (1) the Cash Value from the end of the prior period; (2) minus the

Monthly Deduction; (3) plus applicable interest; (4) plus premiums received; and (5) minus any partial surrenders.

$$\text{Cash Value} = \begin{array}{ll} & \textbf{Prior Period Cash Value} \\ \textit{minus} & \textbf{Monthly Deduction} \\ \textit{plus} & \textbf{Interest} \\ \textit{plus} & \textbf{Premium} \\ \textit{minus} & \textbf{Partial Surrenders} \end{array}$$

where:

**Monthly Deduction = (Cost of Insurance + Rider Charge) + Administrative Fee**

and:

**Cost of Insurance = Mortality Charge x Net Amount at Risk**

See paragraphs 19 – 24. My methodology is consistent with how the determination of the Cash Value is described in the Class Products. My recalculation of the Cost of Insurance does not alter any other components of the Cash Value calculation and keeps them as they historically occurred. Thus, my damages methodology reflects a straightforward calculation of the resulting Cost of Insurance for a given period ███ ███████████████████████████████████████████████████████ instead of the Mortality Rate that Sentry actually used.

43.     Mortality Charges for a given Monthly Deduction can be recalculated using my methodology ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████ Again, this calculation holds all other past policy activity constant and treats all other policy debits and credits to the Cash Value as they actually occurred.

Thus, the overcharge calculation for each policy period requires two straightforward steps:



44.      Interest can then be applied to the amount of the overcharge through the most recent policy date (present date for in-force policies, and date of termination for terminated policies). This is consistent with the terms of the Class Products which provide for application of an interest rate to the Cash Value subject to a guaranteed minimum. I conservatively use the guaranteed minimum interest rate for the demonstration of injury for Ms. Maxon, but the model can easily incorporate the variable credited interest rates that applied for each time period.

45.      Because my methodology only computes the overcharge attributable to the Cost of Insurance that was actually incurred and assumes that all other policy activity remains unchanged, damages can be formulaically calculated for each class member by inspecting the data provided in the policy's annual statements. I have demonstrated how this would be done in Ex. GG. Alternatively ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

46.      I have demonstrated this alternative calculation for Ms. Maxon in the event less than full policy data is available ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

47. ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ Therefore, I am satisfied that the assumptions and methods used in my alternative methodology calculate damages to a reasonable degree of actuarial and mathematical certainty in the event all annual statement data for each class policy is not ultimately available.

48.   At a basic level ████████████████████████████████████

██████████████████████████████████████████████



[redacted]

49.     Using Sentry's own Mortality Rates ███████████████████████ ██████████████████████████████████████ and applying the methodology and formulas described in this declaration, I am able to calculate Count I overcharges and losses to Ms. Maxon resulting from Sentry's ████████████████████████████ ██████████████████████████████ As demonstrated in the attached Exhibit GG, Ms. Maxon was deprived of an additional ███████████ as of year-end December 2016[7] as a result of ████████████████████████████████████████ ████████████████████████████. My alternative calculation, using the same methodology but ███████████████████████████████████████ shows damages to be $ ███████ over the same time frame. Ex. HH. The difference is only ███████.

50.     For Count II the mechanics of the calculation under both methodologies is the same. For purposes of demonstrating my methodologies I have assumed that ███████ ████████████████████████████████████████████████ ███████████████████████ in violation of the fixed expense charges as alleged in Count II. However, I also understand that discovery is ongoing, and to the extent that merits discovery shows that ██████████████████████████████████

---

[7] ████████████████████████████████████████████ ███████████████████████████████████████████ I have applied minimum guaranteed interest on those overcharges through December 2018 as I understand that Ms. Maxon's Policy is still in-force. Because my methodologies can calculate damages as of any point in time, they can easily accommodate additional data to calculate further overcharges █████████████████████████████████ ███████.

████████████ a Count II violation, ██████████████████████████ to the damages calculation to determine the specific overcharges under Count II.

51.    The aforementioned methodologies will calculate to a reasonable degree of actuarial and mathematical certainty the losses for each class policy resulting from Sentry's inclusion of amounts in excess of future mortality expectations in the Mortality Rates.

52.    To calculate losses attributable to Sentry's failure to adjust Mortality Rates, as alleged in Ms. Maxon's Count III, the formula and methodology is modified slightly ████████████████████████████████████

████████████



53.    For purposes of demonstrating my calculation for Ms. Maxon ████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████

54.     Applying the formulas described above, I am able to calculate the overcharges and losses to Ms. Maxon attributable to Sentry's failure to reduce its Mortality Rates███████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ I demonstrate in the attached Exhibit II that Ms. Maxon was deprived of█████████ as a result of Sentry's alleged wrongful conduct. My alternative calculation, using the same methodology███

████████████████████████████████████████████████████████████

███████████Ex. JJ. The difference is only█████████

55.     The aforementioned methodologies will calculate to a reasonable degree of actuarial and mathematical certainty the losses for each class policy resulting from Sentry's failure to reduce Mortality Rates to reflect mortality improvement under Count III.

56.     Applying this formulaic methodology to each class policy, I can determine overcharges and resulting losses for each policy period, and aggregate those to calculate total losses at applicable interest for each policy in the proposed class to a reasonable degree of actuarial and mathematical certainty using either a policy owner's annual statements or available data produced thus far by Sentry. Because I will use the data for each individual policy as produced by Sentry, this methodology does not require any policy owner to provide information. Although the amount of losses for each policy owner may vary, I will apply the same methodology and formula for each policy owner

26

using Sentry's data Calculating class-wide losses under the methodologies is simply an administrative task[8] capable of being performed on a class-wide basis.[9]

---

[8] In my experience as an actuary, I also expect that Sentry has the capacity (particularly in light of the vast amount of data produced) within its administrative systems to substitute alternative scales of Mortality Rates for those actually used, and within those same systems calculate differences in Mortality Charges.

[9] I proposed a similar methodology using past transactional data to arrive at calculated losses accumulated at interest in *Vogt v. State Farm Life Insurance Company* at class certification, and ultimately, I was qualified as an expert at trial where I presented a class-wide damages determination to a jury.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Dated: December 17, 2018

Scott J. Witt, FSA, MAAA