# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

PRUDENCE F. MAXON, individually
and on behalf of all others similarly situated,

        Plaintiff,

                                   **CASE NO. 3:18-cv-00254-slc**

v.

SENTRY LIFE INSURANCE
COMPANY,

        Defendant.

---

## <u>REBUTTAL DECLARATION AND REPORT OF SCOTT J. WITT</u>

I, Scott J. Witt, declare under penalty of perjury as follows:

1.      My name is Scott J. Witt, and I have been engaged by Plaintiff Prudence F. Maxon to provide expert testimony in this case. I previously prepared and submitted a declaration on December 17, 2018 ("Declaration") that is attached as an exhibit to the Brief in Support of Plaintiff's Motion for Class Certification ("Plaintiff's Brief"). My Declaration primarily addresses a methodology for determining past harm and damages resulting from Defendant Sentry Life Insurance Company ("Sentry")'s alleged wrongful conduct. Using Ms. Maxon's Policy as an example, my Declaration demonstrates calculation of damages resulting from Sentry's determination of Mortality Charges and Rates that include factors and amounts in addition to and in excess of its expectations as to future mortality experience for the Class Products.[1] My Declaration further demonstrates a methodology for calculating damages resulting from Sentry's failure to

---

[1] "Class Products" refers to the specimen policies associated with the six life insurance products at issue in this case as defined in ¶ 9 of my Declaration.

determine Mortality Rates based on its current expectations as to future mortality experience as those expectations have improved over time – specifically, those damages resulting from Sentry's alleged failure to adjust Mortality Rates when it experienced sustained and substantial improvement in its mortality expectations.

2.     Since submitting my Declaration, I have now reviewed:

- Sentry's Brief in Opposition to Maxon's Motion for Class Certification, and accompanying materials ("Sentry's Opposition Brief"); and the
- Declaration of Sentry employee Bruce Georgenson in Support of Sentry's Opposition to Maxon's Motion for Class Certification, and exhibits attached thereto ("Georgenson Declaration").

3.     I submit this Rebuttal Declaration and Report ("Rebuttal") in response to alleged deficiencies in my opinion and analysis as raised in Sentry's Opposition Brief and the Georgenson Declaration.

4.     In reaching the opinions expressed in this Rebuttal, I have relied upon the experience, knowledge, and expertise I have gained throughout my career as an actuary, in particular, my knowledge and expertise with respect to universal life insurance products, and I have further relied upon documents and material known to me or generally available to actuaries practicing in the United States.

5.     As stated in my Declaration, my analysis is ongoing, and my opinions are presently directed at inquiries potentially relevant to Ms. Maxon's Motion for Class Certification, including the damages methodology set forth in my Declaration. Therefore, I reserve the right to amend or supplement my opinions and/or methodologies at a later date as discovery in this matter progresses.

6.      My opinions set forth herein have been reached to a reasonable degree of actuarial and mathematical certainty consistent with my training, experience, education, and judgment as an actuary.

## Opinions and Analysis

7.      Nothing in the materials submitted by Sentry or Mr. Georgenson requires me to alter the opinions contained in my Declaration. In fact, Sentry and Mr. Georgenson confirm a number of the assertions made in my Declaration. My purpose in offering this Rebuttal is merely to address a few specific concerns raised by Sentry and Mr. Georgenson. I conclude that those concerns are without merit.

I.      **I have considered applicable real-world implications of employing my damages methodology to calculate damages for proposed class members, and I have concluded that my damages methodology will calculate damages for each proposed class member to a reasonable degree of actuarial and mathematical certainty.**

8.      At the outset, Sentry and Mr. Georgenson assert a general, ambiguous objection to my analysis and damages methodology in contending that I have failed to consider "real-world, practical implications." Sentry's Opposition Brief at p. 14. Sentry's objection appears to be rooted in a perceived failure on my part to take into account the business considerations of Sentry, namely its profit goals, and the general practice in the

industry as to how life insurers typically determine "cost of insurance" rates or "COI rates."[2]

9.     However, it is unnecessary that I analyze the potential impact to Sentry's profit margins in the event that Ms. Maxon succeeds in proving her claims on behalf of the proposed class. Ms. Maxon engaged me to provide a damages methodology that can be applied for her and each member of the proposed class. I was not engaged to determine the impact to Sentry's financials in the event Ms. Maxon is successful in proving her claims. The potential impact to Sentry's profit is irrelevant to my damages methodology and calculation.

10.     Generally speaking, I agree with Sentry and Mr. Georgenson that, when pricing a product, one of an insurance company's objectives is to set various rates, fees and charges so as to achieve product profitability. *See* Georgenson Declaration at ¶ 12.[3]  I do not agree, however, that an insurer should, or is even permitted to, price products in a

---

[2] I note here that Sentry and Mr. Georgenson use the abbreviation "COI" for "cost of insurance," and further, they interchangeably use the term "COI rate" with the term actually used in the Class Products – "Mortality Rate." I can only presume they do so because the repeated use of the term "Mortality" in the relevant provisions may be unfavorable to Sentry's proposed policy interpretation. The Class Products at issue here specifically identify the rate in question as a "Mortality Rate" while other policies in the life insurance industry generally identify similar rates as "cost of insurance rates." I offer no opinion as to how the Court should interpret the policy provisions at issue, but for my opinion and analysis I continue to use the terms and language actually employed by Sentry in the Class Products – "Mortality Rate" and "Mortality Charge."

[3] Although Ms. Maxon alleges that Sentry has wrongfully determined Mortality Rates using non-mortality related considerations (including profit and non-mortality expense factors), Mortality Rates and Charges are not the sole source of profit and expense recovery for the Class Products. The policies also provide for separate expense charges. Sentry also uses as a "source[] of generating income…the 'spread' between the interest earned on the assets held in the general account supporting the [universal life] policies that is in excess of the interest credited to the [] policies." Georgenson Declaration at ¶ 15.

way that is inconsistent with or runs counter to the language contained in the insurance policy.

11.    I am aware that it is common in the industry for insurance companies to price "cost of insurance" rates using factors in addition to their mortality expectations, but I am also aware that it is common practice among insurance companies to draft policies in a way that clearly discloses the broad range of factors that may be used in determining "cost of insurance" rates. I have attached to this Rebuttal several examples of universal life insurance policy forms filed by other life insurers with the Wisconsin Department of Insurance that demonstrate the type of broad disclosure I have routinely seen in my review of universal life insurance policies as a fee-only insurance advisor.

12.    Attached hereto as Ex. KK[4] is a Lincoln Benefit Life Company "Flexible Premium Adjustable Indexed Life Insurance Policy" that contains a "Cost of Insurance" provision stating, in part:

> The cost of insurance rate is *based on multiple factors, including, but not limited to*, the insured's sex, issue age, policy year, payment class and face amount. We may change the cost of insurance rates *for any reason*…

Ex. KK at p. 16 (emphasis added).

13.    Attached hereto as Ex. LL is an Allstate Life Insurance Company "Single Premium Adjustable Life Insurance Contract" that contains a "Cost of Insurance" provision stating, in part:

> The cost of insurance rate is *based on multiple factors, including, but not limited to*, the insured's sex, issue age, contract year and payment class. *We may change the cost of insurance rates for any reason*…

---

[4] For ease of reference, the alphabetical listing of exhibits in my Rebuttal starts where I left off in my Declaration.

Ex. LL at p. 12 (emphasis added).

14.     Attached hereto as Ex. MM is a John Hancock Life Insurance Company (U.S.A.) "Flexible Premium Survivorship Adjustable Life Insurance Policy" that contains a "Cost of Insurance Charge" provision stating, in part:

> The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk…The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and *will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions*…

Ex. MM at p. 11 (emphasis added).

15.     Attached hereto as Ex. NN is a Midland National Life Insurance Company "Flexible Premium Adjustable Life Insurance Policy" that contains a "Cost of Insurance Rate" provision stating, in part:

> We *base* the cost of insurance rates *on future expectations as to investment earnings, mortality experience, persistency, expenses and federal income tax law*.

Ex. NN at p. 12 (emphasis added).

16.     Attached hereto as Ex. OO is a State Farm Life and Accident Assurance Company "Flexible premium adjustable life insurance" policy that contains a "Monthly Cost of Insurance Rates" provision stating, in part:

> We can charge rates that are equal to or less than the Maximum Monthly Cost of Insurance Rates. Such rates and any changes to those rates *will be based on factors set forth in* the Determination of Rates and Charges provision.

And a "Determination of Rates and Charges" provision stating, in part:

> The Monthly Cost of Insurance Rates…are set by Us *based on investment earnings, mortality, expenses, persistency, capital and reserve requirements, taxes and profits*…We may change, *at Our discretion*, the Monthly Cost of Insurance Rates…If We make any changes, the changes will be *based on future expectations as to investment earnings, mortality,*

> *expenses, persistency, capital and reserve requirements, taxes and profits…*

Ex. OO at p. 7, 13 (emphasis added).

17.     I am further aware that Sentry has produced in discovery in this case a "Joint and Last Survivor Adjustable Life Insurance Policy" (a policy that is not included in Ms. Maxon's class definition), a true and correct copy of which is attached hereto as Ex. PP, that contains a "Cost of Insurance" provision which, like the provisions in Exs. KK through OO, discloses a broad range of factors to be considered in determining "Cost of Insurance" rates:

> *COST OF INSURANCE*…The *Cost of Insurance* rate is based on the joint equal issue age, duration and rate class for the Face Amount provided by the original application and each increase in Face Amount…We can change the *Cost of Insurance* rates from time to time. Any change will be based upon the *expectations of future experience*…

Ex. PP at p. 13 (emphasis added). In addition to containing a "Cost of Insurance" provision that references "expectations of future experience" generally, and not specifically "expectations as to future *mortality* experience," this policy also contains a separate "Policy Cost Factors" provision that states, in part:

> POLICY COST FACTORS…Adjustments in policy cost factors (interest, *Cost of Insurance* charges, expense charges) will be by class and *based on* changes in future expectations *for such elements as to investment earnings, mortality, persistency and expenses*.

Ex. PP at p. 13 (emphasis added).

18.     Thus, given my understanding of Ms. Maxon's claims concerning the specific policy language at issue in this case, the general practice of life insurance companies in pricing other products with materially different "cost of insurance" language is inapplicable to my analysis in this case.

## II. Sentry and Mr. Georgenson confirm the Class Products are materially identical universal life policies.

19.     As detailed in my Declaration, the Class Products are universal life policies that are materially identical as to both the relevant policy language and the mechanics of how they operate – particularly as to the mechanics for determining the policy Cash Value, Monthly Deduction, Cost of Insurance, Mortality Charge, and Mortality Rate. Declaration at ¶¶ 10, 17-27.

20.     Mr. Georgenson agrees that "all of the Putative Class Policies are universal life [] insurance policies." Georgenson Declaration at ¶ 7.[5] He further agrees that universal life policies are a form of permanent life insurance, and that "[a]s long as the cash value of the [universal life] policy is sufficient to cover the policy's monthly deduction, the policy remains in force." Georgenson Declaration at ¶ 9. Citing Georgenson's Declaration, Sentry further agrees that each of the Class Products contains: a Monthly Deduction, which is taken from the Cash Value; the Monthly Deduction is calculated, in part, using a Cost of Insurance; the Cost of Insurance is calculated using a Mortality Charge; and the Mortality Charge is determined using a Mortality Rate. *See* Sentry's Opposition Brief at p. 4.

---

[5] Without explanation Mr. Georgenson concludes that the EIWL policy is not a universal life product. While the name of the product ("Excess Interest Whole Life," or its alternative name, "Contemporary Life Plus") does not specifically contain the word "universal," it has the same relevant characteristics of the other Class Products as explained more fully in my Declaration. ████████████████████████████ ████████████████████████████████████████. *See*, *e.g.*, Declaration, Ex. K at Sentry001574 (1995 Sentry mortality study), Ex. Y at Sentry001725 (2010 Sentry mortality study), Ex. EE at p. 4 (2016 Sentry mortality study) ████████████████████████████████████████████).

21.     Critically, Mr. Georgenson goes one step further than acknowledging the similarities in how the Class Products calculate Cash Values. After first detailing the approach and process for Sentry's pricing of the "Putative Class Policies," Mr. Georgenson then confirms that the same approach and process "applied to Sentry's pricing (and inforce management) of each of the Putative Class Policies." *See* Georgenson Declaration at ¶¶ 32, 19-30.

22.     These statements are consistent with ████████████████████ ████████████████████████████████, which again support my conclusion that the Class Products are materially identical. Declaration at ¶¶ 10, 17-27.

### III.     Administration of my damages methodology to each of the class policies will incorporate rates and assumptions applicable to each of the Class Products.

23.     Asserting that my damages methodology would apply Comp II[6] assumptions to all other Class Products regardless of whether the assumptions associated with each product are different than Comp II (*see* Sentry's Opposition Brief at p. 15; Georgenson Declaration at ¶ 47), Sentry and Mr. Georgenson mischaracterize my methodology. I clearly state in my Declaration that the intended purpose of my methodology is "calculating amounts deducted in excess of Sentry's expectations as to future mortality experience *for the Class Products*." Declaration at ¶ 40 (emphasis added). Under my methodology, I use policy-level transactional data, which is specific to each individual policy (Declaration at ¶ 40), and, therefore, specific to the Class Product associated with each policy, ████████████████████████████

---

[6] "Comp II" refers to Sentry's Comprehensive Universal Life II product as defined in ¶ 9 of my Declaration. The Comp II is the underlying policy form that was purchased by Ms. Maxon.

███████████████████████████████████████████

██████████████████████████████████████████ Declaration at

¶ 43. In other words, my calculation uses Mortality Rate tables associated with each Class

Product and treats "all other policy debits and credits…as they actually occurred."

Declaration at ¶ 43.

24.     There is simply nothing in my Declaration suggesting I would use

anything other than rates, data, and assumptions that are *associated with and applicable

to each class policy*. *See* above and Declaration generally.

25.     The methodology employed as to each policy would be the same as what I

have demonstrated for Ms. Maxon. In other words, while the data inputs – in terms of

rate tables, policy-level data, or pricing assumptions, for instance – may be different from

one policy to the next depending on the Class Product associated with the policy, my

methodology operates the same for all. The categories of inputs are the same. And, if

there are differences between the data inputs from product to product, I simply substitute

one input for another (for example, for an EIWL policy I would use the Mortality Rate

scales used for EIWL policies, but for a Comp II policy I would use the Mortality Rate

scales applicable for Comp II policies).

26.     I am simply determining ████████████████████████

████████████████████████████████████████████

███████████████████. The "respects" in which Sentry alleges the Class

Products "vary" on p. 39 of its Opposition Brief present no hurdle to my methodology. I

am working from past data, rate tables, and assumptions that Sentry has provided in this

litigation. Therefore, any alleged variation among Class Products – in "administrative

systems, which influenced the manner in which [Mortality] rates are determined;" rate "banding" by policy size; "interest crediting structure" or "persistency bonuses;" issue size limitations; or differentiation in Mortality Rate classes –present no problem because Sentry has provided Mortality Rate scales that were actually used. In other words, I do not need to reproduce Mortality Rate scales from scratch. Similarly, ██████████████ ██████████████████████████████ (and again, because I have the Mortality Rate scales themselves), Sentry's asserted differences in such fees are of no consequence.

## IV. My analysis and damages methodology rely upon assumptions and considerations that are actuarially and mathematically sound and reasonable.

27.     In addition to alleged variation between Class Products, Sentry further asserts that my analysis fails to account for variation between policyholder activity. Sentry states that I "fail[] to account for…variations in policyholder behavior among the universe of Putative Class Policies that would impact COI charges, such as policy lapse and reinstatements, changes in specified amounts, application of monthly deduction waivers, and lump sum premium payments and other policy funding choices." Sentry's Opposition Brief at p. 15. Sentry goes on to state that, due to such variation in policyholder activity, my methodology for determination of damages prior to 2009 is entirely speculative and "mere guesswork." Sentry's Opposition Brief at p. 39. These assertions are incorrect.

28.     There is nothing speculative about my proposed damages methodology, because it uses available *historical* policy data, amounts, and activity to retrospectively calculate *past* damages resulting from Sentry's alleged wrongful conduct from a fixed point in time – the present date for currently in-force policies and the date of termination

for previously terminated policies. Thus, any variations or changes to policy assumptions or data that would have an effect on damages are reflected in my methodology because they are reflected in Sentry's historical data.

29.    Using Ms. Maxon's policy as an example, I have demonstrated how damages are calculated when complete past policy data is available in Ex. GG and II to my Declaration. Sentry and Mr. Georgenson do not object to the mechanics of the damages methodology I employ where complete data is available for a given year that a policy is in force. Rather, the crux of their criticism that my analysis is speculative and does not incorporate variation in policyholder behavior is directed at the "alternative" methodology that I would use ███████████████████████████████ ███████████████████████.

30.    In my Declaration, ███████████████████████████████ ██████████████████████████████████ (Declaration at ¶ 46), and I demonstrate how I can calculate damages for pre-2009 overcharges using an alternative methodology.  Thus, in the event less than full data is available ███████████████ ████████████████████████████████████████ █████████ ████████████████████████████████████████████ ███████████████████████████ Declaration at ¶ 46.

31.    The techniques I employ for that extrapolation are not "mere guesswork." They use ████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████. █████████████ ████████████████████████████████████████



Thus, the hypothetical scenario offered by Mr. Georgenson's exhibit 10 where a policyholder "*might* fund her policy differently" (Sentry's Opposition Brief at p. 40) does nothing to invalidate the actuarial and mathematical assumptions I have made in my alternative methodology to account for Sentry's failure to maintain and produce policy level data.

32.     To the extent my model is "simplistic," as Sentry and Mr. Georgenson assert,

███████████████████████████████████████████████.[8] Sentry's actual Mortality Rates ██████████████████████████████████ and Sentry's expectations as to future mortality experience are quantifiable rates. Sentry has produced materials evidencing those rates. Therefore, to determine damages resulting from Sentry's alleged wrongful conduct under Counts I and II, I compare ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████. In this way, I can determine ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████. Declaration at ¶¶ 40-51.

33.    For Ms. Maxon's Count III, I did a similar comparison. Declaration at ¶ 52. Sentry "routinely monitors experience factors" including mortality. Georgenson Dec. at ¶ 21. One reason for doing so is that an actuary will use actual mortality experience to determine anticipated or expected mortality experience. See, for instance, Actuarial Standard of Practice No. 24 ("To the extent actual experience is determinable, available, and credible, the actuary should use actual experience when setting experience factors…") ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████. Declaration at ¶¶ 34-39. █████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

<hr />



(as asserted under Count III). Declaration at ¶ 52.

34.

. Declaration at ¶¶ 43, 52. And, to the extent Sentry and Mr. Georgenson argue it is too "simplistic" to apply to 17,000+ policies, I note again that I recently testified at trial to a similar damages methodology that I submitted for tens of thousands of policy owners in *Vogt v. State Farm Life Insurance Company*. Declaration at fn. 9.

**V.    Sentry's testimony and internal documents, including its mortality studies, evidence that Sentry experienced sustained, consistent, and favorable mortality over two decades.**

35.    The methodology for Count III calculates overcharges attributable to Sentry's failure to adjust its Mortality Rates to reflect its then current expectations as to future mortality experience as those expectations have changed over time.

Declaration at ¶¶ 34-39, 53-54.

36.    In criticizing my Count III analysis, Sentry and Mr. Georgenson argue that it: (1) "disregards actuarial standards of practice aimed at ensuring consideration of credible experience, including a failure to consider the import of Sentry's size as a small insurance company;" (2) ignores that Sentry's mortality experience for Class Products

"reveals significant volatility from year to year;" and (3) overlooks "practical implications of repricing based on such unstable experience." Sentry's Opposition Brief at p. 14-15.

37.     Central to its criticism of my Count III analysis is Sentry's conclusion that: "[w]hile he fails to specify with what frequency such adjustments should occur, it appears that Plaintiff would have Sentry adjust its [Mortality] rates every year based on the prior year's mortality experience – something Plaintiff's expert fails to establish has ever been done by any life insurer." Sentry's Opposition Brief at p. 14. But nowhere in my Declaration do I assert that Mortality Rates would need to be adjusted every year.

38.     I do not understand Ms. Maxon's Count III claim to dictate that Sentry adjust its Mortality Rate scales on an annual basis, and I certainly would expect that adjustments in Mortality Rate scales would occur only when credible experience showed that Sentry's expectations as to future mortality experience required actuarial adjustment.

39.     Mortality Rates and Charges, and the expectations as to future mortality experience used to determine Mortality Rates, are examples of "nonguaranteed" charges or elements. They are "nonguaranteed" because they are subject to change. Actuarial Standard of Practice No. 2 ("ASOP No. 2") provides actuarial guidance as to "Nonguaranteed Charges or Benefits for Life Insurance Policies and Annuity Contracts," and identifies "mortality charges" among the "[e]xamples of nonguaranteed charges." ASOP No. 2 also identifies "mortality" as an example of an "anticipated experience factor" – or "[a]n assumption that reflects anticipated experience and may be used to determine nonguaranteed charges…A particular anticipated experience factor reflects future experience of a specific type."

40.    Sentry "routinely monitors experience factors" including mortality. Georgenson Declaration at ¶ 21. For guidance on a credible time frame of experience for making changes to "nonguaranteed" rates or elements, I looked at Sentry's filings with the National Association of Insurance Commissioners ("NAIC"), which state that the "assumptions upon which nonguaranteed elements are based will be periodically reviewed." As an example of such a filing, *see* Sentry's 2017 response to certain "actuarial interrogatories," attached hereto as Ex. QQ, at p. 370. Sentry's NAIC filings confirm that "Mortality assumptions for inforce policies will be reviewed whenever the mortality assumptions for comparable new issues are changed, but in no event more often than once each policy year nor less often than once every five policy years." Ex. QQ at p. 370.

41.    ███████████████████████ in other documentation produced by Sentry in this litigation. For example, █████████████████████████ █████████████████████ (attached as Exhibit 4 to Georgenson's Declaration), states, in part:



Georgenson Declaration at Ex. 4, Sentry001888.

42.     Nevertheless, ████████████████████████████████████
████████████████████████████████████████████, it was particularly
unnecessary for me to specify the frequency with which Sentry should have adjusted
Mortality Rates when demonstrating the Count III methodology set forth in my
Declaration.

43.     Drawing on my experience as an insurance actuary, I disagree with Mr.
Georgenson's assessment that Sentry's mortality experience revealed significant
"volatility" from year to year, and ultimately, Mr. Georgenson's recommended approach
for analyzing mortality experience actually supports my assessment of Sentry's mortality
improvement as included in my Declaration.

44.     Mr. Georgenson states: "As compared to other life insurance companies,
Sentry is a small insurer with, relatively speaking, for any given period, a smaller volume
of claims that can be considered in connection with efforts to evaluate its experience."
Georgenson Declaration at ¶ 36. Mr. Georgenson gives a few examples for why, as a
small insurer, Sentry's mortality experience over a short time frame may be unreliable.
For one of those examples he points to a September 1985 memo from a Sentry employee
where it was observed that ████████████████████████████████████████
█████████████. Georgenson Declaration at ¶ 36. Thus, Mr. Georgenson states that "when
reviewing mortality experience at large the actuary has to take a holistic view."
Georgenson Declaration at ¶ 37.

45.     Rather than relying upon the type of short-term, small sample size
"volatility" Mr. Georgenson asserts is exhibited by Sentry's mortality studies (████████
████████████████████████████████████████████████████), I have

instead taken the type of "holistic view" Mr. Georgenson advocates, and relied on more credible experience ███████████████████████████████████████████ ███████.

46.      As demonstrated in my Declaration, this "holistic view" shows that, ████████████████████████████████████████████████ ███████████████████████████████████████████████. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████. *See* Declaration at ¶ 38. Sentry's 2015 Individual Life Mortality Study demonstrates ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████. Declaration, Ex. DD at p. 4.

47.      ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████



48.     Sentry's ████████████████████████████████████████████ ███████████ demonstrates a lack of the type of volatility portrayed by Mr. Georgenson. This ████████ ████████████████████████████ also negates Sentry's concern as to the practical implications of repricing based on unstable experience. Credible evidence from Sentry suggests that, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████.

49.     I find it contradictory that Sentry ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████. *See* Declaration at Ex. FF; Georgenson Declaration at ¶ 22.

50.     Furthermore, Sentry and Mr. Georgenson's position that my mortality improvement analysis fails to acknowledge the impact of anti-selection resulting from its decision to increase Mortality Rates on Class Products ████████████████ is also without merit. Sentry's Opposition Brief at p. 15. I relied on Sentry's own mortality studies, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████, so there is no need to hypothesize about what may or may not have happened. For instance, if Sentry did change its pricing to reflect changes in mortality (as it did in some

instances), future mortality studies would automatically reflect any policyholder behavioral changes attributable to the repricing.

51.     Finally, I disagree with Mr. Georgenson's position that the 2017 CSO and mainstream publications are evidence of worsening of mortality (mortality rates going up). In the first instance, the 2017 CSO table and "mainstream publications" do not represent *Sentry's* expectations as to future mortality experience. To the extent that either the 2017 CSO table or "mainstream publications" show recent worsening of mortality, such worsening is in relation to recent mortality experience and does not negate that mortality has improved substantially as compared to more than two decades ago when the Class Products were last priced. Also, there is ample industry evidence of mortality improvement since the time the Class Products were last priced. Even commentary from the Report on the 2017 CSO and 2017 CSO Preferred Structure Table Development (from the joint effort of the Society of Actuaries and American Academy of Actuaries) makes it clear that mortality has significantly improved in the last decades. Attached hereto as Ex. RR. "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, *industry experience studies* performed by the Society of Actuaries Individual Life Experience Committee [] *have shown significant improvement in the mortality rates experienced by the industry* from that underlying the 2001 CSO table development." Ex. RR at p. 3 (emphasis added).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Dated:  March 4, 2019

Scott J. Witt, FSA, MAAA